GAY et al. v. HUDSON RIVER ELECTRIC POWER CO. et al.

(Circuit Court, N. D. New York.   July 10, 1911.)

1. CORPORATIONS (§ 482*)—FORECLOSURE SUITS AGAINST ALLIED CORPORATIONS—CONSOLIDATION.

Eight corporations, engaged in the development and use of water power, the manufacture and sale of gas, and the generating, transmission, and sale of electricity by furnishing electric lights and power to various cities and towns throughout a considerable territory and to consumers therein, were managed and controlled and largely owned by the same persons, and for a number of years were practically operated as one: the earnings and the proceeds of mortgages made by the different companies being used largely as a common fund for the benefit of all. The business of the several companies was also to a large extent interdependent, some generating electricity only, which was transmitted by others and to some extent distributed and sold by still others. *Held*, that separate suits to foreclose mortgages given by the several companies would be consolidated with a view, if possible, of selling the properties together to be operated as a single system; it appearing that they were worth more and should realize a better price if so sold than if segregated.

[Ed. Note.—For other cases, see Corporations, Dec. Dig. § 482.*]

2. CORPORATIONS (§ 482*)—FORECLOSURE SUITS AGAINST ALLIED CORPORATIONS—INSOLVENCY—PROOF OF CLAIMS.

Where all, or nearly all, of the companies defendant in such consolidated suit were insolvent, and there are general creditors of each whose claims have been proved, a sale of the property will not be delayed to await the adjustment of mutual claims between the several defendants which for the most part, so far as appears, cannot be paid for want of funds.

[Ed. Note.—For other cases, see Corporations, Dec. Dig. § 482.*]

3. CORPORATIONS (§ 484*)—POWERS—GUARANTY.

A contract by a corporation written on bonds issued by another corporation which it controlled through stock ownership, providing that it "hereby indorses the within bond and guarantees to the holder  *  *  * the payment in full of the principal and interest as provided thereby," to secure which it gave a collateral mortgage on its own property, *held* not a contract of indorsement, but one of guaranty, and within the powers of the corporation if authorized by the stockholders as required by Laws N. Y. 1892, c. 688, § 40.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1815; Dec. Dig. § 484.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

4. CORPORATIONS (§ 484*)—POWERS—GUARANTY.

Under Laws N. Y. 1892, c. 688, § 40, which authorizes a corporation to guarantee the bonds of any other domestic corporation engaged in the same general line of business pursuant to a unanimous vote of its stockholders, where such a guaranty recites that the guarantor "has voted and agreed to indorse and guarantee the payment of the within bond and all other bonds of the same series," the presumption, in the absence of evidence to the contrary, is that the guaranty was authorized by vote of the stockholders in compliance with the statute.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1815; Dec. Dig. § 484.*]

5. CORPORATIONS (§ 484*)—GUARANTY—ESTOPPEL TO DENY POWER.

Where a guaranty of the bonds of one corporation by another was authorized by statute when made pursuant to the unanimous vote of the stockholders at a special meeting called for the purpose, the fact of irregularity in the exercise of the power so granted does not render the guaranty ultra vires and void as to bona fide purchasers of the bonds without notice.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1815; Dec. Dig. § 484.*]

6. CORPORATIONS (§ 432*)—REPRESENTATION BY OFFICERS—PRESUMPTION OF AUTHORITY FROM USE OF SEAL.

The seal of a corporation affixed to a written instrument executed by its officers in the business of the corporation imports and raises a presumption that they were duly authorized to execute the instrument.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1717–1730; Dec. Dig. § 432.*]

7. CORPORATIONS (§ 544*)—PREFERENCE—MORTGAGES—VALIDITY.

Laws N. Y. 1901, c. 354, § 48, which declares void any conveyance or transfer of property made by a corporation when insolvent or its insolvency is imminent with intent to prefer a creditor, does not render void a mortgage given by a corporation to secure its guaranty of the bonds of another corporation previously issued, where such mortgage was given pursuant to an antecedent agreement made in good faith and for a valuable consideration at the time of the guaranty and when the guarantor was not insolvent nor its insolvency imminent, although it was insolvent when the mortgage was executed and may have intended to give the mortgagee a preference over other creditors.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2162–2169; Dec. Dig. § 544.*]

8. CORPORATIONS (§ 473*)—BONDS—RIGHTS OF HOLDERS—INSOLVENCY—EQUITABLE LIEN.

Where a mortgage, executed by an electric company having transmission lines but no plant for generating electricity to secure bonds, provided that such bonds might be issued for the purpose of acquiring stock, bonds, rights, or franchises, or in improving property rights or franchises owned by the corporation or in which it had an interest, the use of proceeds of the bonds to aid in the completion of the works of a water power company in which it was interested, to develop power to be used in generating electricity, the advances being treated as a loan by the two companies, was not a diversion of which the mortgagee could complain or which gave it, on behalf of the bondholders, an equitable lien on the property of the power company as against its own bondholders.

[Ed. Note.—For other cases, see Corporations, Dec. Dig. § 473.*]

9. CORPORATIONS (§ 566*)—INSOLVENCY—PRIORITY OF CLAIMS—EQUITABLE LIENS—MISAPPLICATION OF TRUST FUND.

That a creditor had an equitable lien on money which was disbursed by a corporation does not entitle such creditor to an equitable lien on

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the property of the corporation as against its bondholders holding a prior mortgage thereon, where it is not shown that the money was used for any purpose which resulted in benefit to them; nor is the creditor entitled to a lien on the property of allied corporations as against their prior mortgage bondholders because the corporation having the money made advances therefrom, which were in effect loans, to the mortgagor companies to pay interest to such bondholders who had no knowledge or notice of such fact.

[Ed. Note.—For other cases, see Corporations, Dec. Dig. § 566.*]

**10.** Deposits in Court (§ 9*)—Rights of Parties—Equitable Lien—Deposit Required by Court.

A judgment creditor of a corporation, whose judgment was afterward reversed, with others, filed a petition in involuntary bankruptcy against the corporation on which a receiver was appointed. The corporation denied the jurisdiction of the court over it and pending determination of the question obtained the discharge of the receiver and a restoration of its property on condition that it deposit with a trustee appointed by the court money and securities to cover the judgment creditor's claim. Subsequently by order of the court the fund so deposited was released and returned to the corporation without condition, and still later the proceedings were dismissed for want of jurisdiction. Held, that the creditor, who afterward obtained another judgment, had no lien on the money so deposited in compliance with the unauthorized order of the court, which followed it after its release and return to the corporation.

[Ed. Note.—For other cases, see Deposits in Court, Dec. Dig. § 9.*]

**11.** Mortgages (§ 163*)—Bona Fide Mortgagee—Record of Deed.

One of two associated corporations having the same office and practically the same officers executed three deeds conveying to the other separate pieces of real estate of which it was the record owner and in possession. Two of the deeds were never recorded, but were found in the safe used by the two companies in common, and the third was not recorded until a year after its execution. There was no evidence of a change of possession. Shortly after their execution the property conveyed was mortgaged by each corporation, the grantee by specific reference thereto or to the deeds, and the grantor by a general mortgage of all its property not excepted. The grantor's mortgage was recorded prior to the recording of the one deed which was recorded. Held, that the grantor's mortgage, accepted without knowledge or notice of the unrecorded deeds, must prevail over those given by the grantee.

[Ed. Note.—For other cases, see Mortgages, Cent. Dig. §§ 368–379; Dec. Dig. § 163.*]

In Equity. Suits by Eben H. Gay and Joseph W. Jackson against Hudson River Electric Power Company, Hudson River Water Power Company, and others; by Trust Company of America, trustee, against Hudson River Water Power Company and others; by Morton Trust Company, now Guaranty Trust Company of New York, as trustee, etc., against Hudson River Electric Company and others; by Knickerbocker Trust Company, as trustee, etc., against Hudson River Electric Power Company and others; by Knickerbocker Trust Company, as trustee, etc., against Hudson River Power Transmission Company and others; by New York Trust Company, formerly New York Security & Trust Company, as trustee, etc., against Saratoga Gas, Electric Light & Power Company and others; by Trust Company of America, as trustee, etc., against Madison County Gas & Electric Company and others; and by National Contracting Company against Hudson River Water Power Company and others. Motion, first, for

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the consolidation of the six pending foreclosure suits, all ancillary to the main equity suit, and, second, to postpone for the present the proof of the claims of the eight defendant companies as against each other; application by the receivers of said corporations for settlement of their accounts and motion for allowances to themselves and their solicitors, and finally hearing on exceptions to masters' reports in certain of the foreclosures and on allegations to obtain decree establishing certain alleged equitable liens; and finally application for a decree of sale, etc., in the consolidated foreclosure if the consolidation order is granted. Decree ordered.

See, also, 184 Fed. 631, 106 C. C. A. 643; 186 Fed. 410; 190 Fed. 812.

Abram J. Rose and Geo. B. Curtiss, for receivers.

W. D. Loucks, for Eben H. Gay and Joseph W. Jackson.

Charles E. Hotchkiss, for Knickerbocker Trust Co.

Franklin H. Mills, for Morton Trust Co., now Guaranty Trust Co.

John G. Boston, for Trust Co. of America.

Morgan M. Mann, for New York Trust Co.

Alfred A. Cook and Mr. Heermance, for certain bondholders of Hudson River Water Power Co.

Charles H. Tyler and R. A. Pritchard, for Boston Bondholders' Committee.

L. Laflin Kellogg, P. M. Brett, and Mr. Pette, for National Contracting Co.

Horace E. McKnight, for McKnight and Medbury, as trustees.

Edgar T. Brackett, for creditors of Saratoga Gas, Electric Light & Power Co.

F. D. Corey, for intervener Green.

RAY, District Judge. [1] The bill in the equity suit was presented about October 26, 1908, and, on notice to all concerned, George W. Dunn, Charles W. Andrews, and Milton Delano were appointed receivers of the eight defendant corporations, and, having qualified, took possession of their respective properties and have been running them and continuing their business since.

Not long after the organization of the said Hudson River Water Power Company and the ability of its plant to do business had accrued, and about or prior to January, 1904, by purchase of stock, etc., the control and management of all the companies came into the same hands, and thereafter they were in effect and in fact run and managed as one concern. In the meantime and during the construction, extension, and improvement of certain of the plants, the trust mortgages involved in these foreclosures, except one, were executed and bonds issued and sold to raise money with which to prosecute the work, purchase rights, construct dams, power plants, etc. These bonds to the amount of several millions of dollars, at least, were marketed, and most if not all of those so sold have passed to the hands of bona fide holders. The general scheme or plan of those who originally had control of the new plants being constructed, which are the main

ones, and who subsequently, in the manner referred to, obtained control of the others, was to construct and obtain control of water rights on the Hudson river and at other points, erect dams and plants for the generation of electricity and electrical power, obtain control of or construct steam plants for the same purpose and also of gas plants when necessary, extending over a large territory; extending into Vermont, south from Glens Falls to Albany, Troy and Schenectady, and other points in that vicinity, and up the Mohawk Valley as far as Utica and to Oneida further west. This scheme contemplated the erection of transmission lines, some of which were constructed, and the generation and distribution of electricity for furnishing light and power over this area of hundreds of square miles by water power in the main using the steam plants in case of low water only. This general plan and scheme was illustrated and shown by maps and printed statements, and on these representations, largely, the bonds of the companies were marketed.

As stated, for some years the plants were run as one concern under one management. The earnings of all the companies were massed and used for the benefit of all. Money borrowed and property and supplies purchased were used for the benefit of all. The proceeds of bonds sold went for the benefit of three or four of these corporations at least, and in some cases for the benefit of all. The same officers and the same employés in part did the work for all the companies. The Oneida plant was an exception in some respects. It is far from probable that it can ever be known what the equities are between these several corporations if torn apart, so to speak, and sold as separate concerns. Some, one at least, generate electricity and do nothing else. Some generate electricity and manufacture gas and do nothing else, while some transmit and others both generate and manufacture and transmit and sell. Connected and operated as one whole as a system, they are of great value. As single corporations some would be of little value. If these corporate properties are separated, go apart, and efforts are made by litigation, as would be inevitable, to settle their rights as between themselves and then establish business relations, the litigations would be ruinous and well-nigh endless. The claim of the National Contracting Company against the Hudson River Water Power Company has been in litigation for 10 years, and the end does not seem near. There are also reasons growing out of the making of the mortgages; one company guaranteeing those of another, etc., which make the consolidation advisable.

Having this situation in view, and having in mind the possible results of independent sales of these properties at different times by several masters, I am constrained to grant the motion for a consolidation. I am unable to see how harm can come to any interest by so doing, and in the judgment of the court good will come and much needless litigation and expense be avoided by the consolidation. The court will retain control so as to compel a separate and speedy sale in a given case should there be in evidence any disposition to unduly delay the sale of all or any one of these properties. Opposition to con-

solidation comes from the trustees of the Oneida plant and the Saratoga plant. I do not see any equity in the Oneida plant; but at the same time it will sell for more in my judgment if sold at the same time and place as the others. If the same party who purchases the others desires this as a future market, he or they will give more for it than its real present value as a single independent concern.

The Saratoga plant or corporation seems to be a solvent corporation. If there is any equity—and I think there is—after paying all debts, all creditors secured and unsecured, the surplus will go to the owners or owner of the stock or to creditors of one or more of the other corporations who are interested in various ways. I am not able to see that consolidation will seriously affect the rights of any one interested in the Saratoga Company.

### Proof of Claims.

[2] All claims of general creditors against the various corporations involved have been proved before a special master, except the claims of the one company against another or others. I do not see that it is essential to determine these claims, their validity and amount, prior to a sale of the properties. If one party purchases all the properties, it may be unnecessary to litigate these claims. If the properties go to different purchasers, the amount of a debt, not a lien, owing by the one corporation to another corporation, is immaterial to the purchaser. It in no way affects his title or the value of the property. If the purchase price is sufficient to create a surplus after payment of mortgage bonds, other liens, costs, and expenses, it will go to the general creditors of that particular corporation. This surplus will be in the hands of the receivers of the corporation applicable to the payment of all its unsecured debts. If it then appears that such one of these corporations is indebted to another of these corporations, or that it asserts a claim, it will be competent for the court in the equity action to direct that proof of such claim and its amount be taken. Here only one or two of these corporate properties, if any, will bring more than the mortgage liens, and as now informed it appears that such possible surplus is subject to other claims or liens. If one corporation has a valid claim against another, or more than one, and such corporations have nothing for general creditors, why go to the expense of establishing such claim or claims? There may be some property not subject to the mortgage liens. If there is enough of this to interest the general creditors, these claims can be then established by litigation. In any event, it seems clear to me that the granting of a decree in foreclosure and a sale under it should not be delayed pending a settlement of these questions which can be settled after the existence of a surplus and in a contest over the distribution of the surplus quite as well as prior to the sale. In fact, the surplus and other property may be so small that a contest will seem inadvisable. In short, I am pointed to no valid objection to a postponement of the settlement of these controversies until after a sale. This motion, also, will be granted.

National Contracting Company Objects to Decree of Sale.

The Trust Company of America, by intervening cross-bill, the National Contracting Company answering, under which evidence has been taken and the report of the special master filed and excepted to, seeks a decree in foreclosure of a mortgage for $2,000,000, dated November 15, 1899, made by Hudson River Water Power Company to the Trust Company of America as trustee, to secure the payment of an issue of 2,000 bonds of the par value of $1,000 each. This mortgage was duly recorded and the bonds issued to the Water Power Company. The Hudson River Water Power Company was incorporated November 11, 1899, with an original stock issue of $2,000,000, increased December 23, 1902, to $5,000,000. It commenced the construction of a dam across the Hudson river at Spier Falls very soon thereafter, acquiring lands and water rights and purchasing materials, etc., and erecting a plant for the generation of electrical power, and such plant was put in operation. In its business it made a contract with the National Contracting Company for the construction of this dam, and the Contracting Company partially constructed same; but differences arose, and the work was abandoned, each party claiming that the other had violated and broken the contract. As that litigation now stands, it has been adjudicated that the Hudson River Water Power Company broke the contract; that a cause of action accrued to the National Contracting Company on the 23d day of November, 1900; and that it sustained damages in the sum of $323,387.-55 for which sum judgment was entered December 23, 1909. Of this about $103,718.52 is for work, labor, and material put into the dam, and the balance for profits the plaintiff in that action would have derived had it been allowed to complete its contract. In short, the National Contracting Company is a judgment creditor to the amount of $323,387.55 and interest. To maintain foreclosure and become entitled to a decree of sale, it is necessary that complainant Trust Company of America shall have shown that Hudson River Water Power Company was in default under the terms of the mortgage to such an extent and in such a manner as to entitle it to foreclose, and in this case this involved a showing that payments had not been made as provided by the mortgage, that such default had not been cured, and that proper action had been taken to ripen the right to foreclose. It seemes to me that I am foreclosed on this subject by my action in making an order authorizing the foreclosure suit. All the objections in this regard now urged were then present, and, having arrived at the conclusion that default justifying foreclosure had occurred, the suit by cross-bill was authorized. This is the underlying mortgage, and a sale thereunder will give title, and equitable liens, if any exist, can attach to the proceeds of sale or otherwise be provided for. There is no good reason why a decree of sale should wait upon the final determination of those questions.

The Morton Trust Company, now Guaranty Trust Company, by intervening cross-bill, answer interposed, and report of special master filed, seeks a decree in foreclosure and sale under two mortgages,

viz., one of $3,000,000 to Morton Trust Company as trustee, dated December 18, 1901, and made by the Hudson River Electric Company to secure the payment of an issue of 3,000 bonds of the par value of $1,000 each, and the other for $3,000,000, dated July 19, 1902, made by the Hudson River Water Power Company to said Morton Trust Company as trustee to secure the guaranty of the Hudson River Water Power Company of the bonds ($3,000,000) issued under the said mortgage of said Hudson River Electric Company, dated December 18, 1901. The said bonds were issued and guaranteed by the Hudson River Water Power Company. The National Contracting Company not only attacks the validity of this collateral mortgage of the Hudson River Water Power Company, but claims that, if valid for any purpose, its claim, now reduced to judgment, is in equity a lien on the property of that company prior to that of the Morton Trust Company as trustee thereunder.

As I understand, the situation on the facts is substantially as follows:

### Hudson River Power Transmission Company.

The Hudson River Power Transmission Company (the first of these Hudson River Companies) was incorporated July 16, 1897; capital stock $750,000. March 15, 1898, it executed a mortgage to the Mercantile Trust Company as trustee, to secure bonds to the amount of $500,000, and August 1, 1899, it issued debenture bonds to the amount of $150,000, and June 15, 1905, it executed a refunding mortgage to the Knickerbocker Trust Company as trustee to secure an issue of bonds to the amount of $1,250,000, of which $750,000, are outstanding.

### Hudson River Water Power Company.

The Hudson River Water Power Company was incorporated November 11, 1899, with a capital stock of $2,000,000, increased December 23, 1902, to $5,000,000. Its first mortgage to the Trust Company of America for $2,000,000 has already been described; also, the second mortgage of $3,000,000, or the guarantee mortgage.

### Hudson River Electric Company.

This, the third of these companies organized, was incorporated April 23, 1901, with an original stock issue of $1,000,000, increased July 17, 1902, to $3,000,000. December 18, 1901, it made the mortgage referred to to Morton Trust Company for $3,000,000 to secure bonds guaranteed as stated by the Hudson River Water Power Company and to secure which guaranty the mortgage of July 19, 1902, was executed.

### Hudson River Electric Power Company.

This, the fourth of these corporations, was incorporated December 28, 1903, with a capital stock of $1,000,000, increased April 15, 1905, to $10,000,000. January 2, 1904, this company executed its mortgage to the Knickerbocker Trust Company as trustee to secure

a bond issue of $5,000,000 par value, and these bonds were guaranteed by the Hudson River Water Power Company. April 8, 1905, said Hudson River Water Power Company executed a collateral mortgage to said Knickerbocker Trust Company, as trustee, to secure such guaranty.

## Control of Other Corporations.

The Hudson River Water Power Company acquired a controlling stock ownership of the Saratoga Gas, Electric Light & Power Company, a corporation having a capital stock of $100,000, and the property of which is subject to a mortgage of $200,000, held by the New York Trust Company, formerly New York Security & Trust Company, as trustee, and under which a decree of foreclosure and sale is also sought; a controlling stock ownership of the Ballston Spa Light & Power Company, a corporation having a capital stock of $35,000, and the property of which is subject to a mortgage of $35,000, no foreclosure pending; a controlling stock ownership of the Empire State Power Company, a corporation having a capital stock of $1,000,000, and the property of which is subject to a mortgage of $1,500,000, $210,000 of bonds issued under it outstanding, and which mortgage is in process of strict foreclosure by advertisement under the conditions of such mortgage, and therefore not subject to the control of this court; and also a controlling stock ownership of the Madison County Gas & Electric Company, a corporation having a capital stock of $300,000, and the property of which corporation is subject to the lien of a mortgage or mortgages for $500,000 and certain receivers' certificates.

## Officers and Control.

In 1904 and 1905, Eugene L. Ashley was the president of said Transmission Company and said Hudson River Water Power Company. W. H. Trumbull was the vice president of said companies. Elmer J. West was secretary and treasurer of the Transmission Company and secretary of said Water Power Company; Eben H. Gay being its treasurer. Said Ashley, West, and Trumbull were three of the five directors of both the Transmission Company and the Water Power Company. Thomas Thompson and L. W. Guernsey were directors in said Transmission Company, and Eben H. Gay and Charles E. Parsons were directors in the Water Power Company. In 1904, C. H. Peddrick was president of the said Electric Company, said W. H. Trumbull its vice president, said Gay its treasurer, and said West its secretary. In 1905, Peddrick was its president, H. B. Austin its vice president, said Gay its treasurer, and said West its secretary. In 1904 and 1905, the officers of the Hudson River Electric Power Company were said West, president; said Guernsey, vice president; said Gay, treasurer; and C. M. Doolittle, secretary. Trumbull was a partner of Mr. Gay, and Peddrick was an employé of the Hudson River Water Power Company of which Mr. Ashley was president.

[3] Up to May 1, 1905, the Hudson River Water Power Company was the parent or controlling corporation, receiving all the earn-

ings and making all the disbursements; the funds being commingled as before stated. Subsequent to May 1, 1905, the Hudson River Electric Power Company was the parent and controlling corporation and continued as such doing the business in the same way up to the appointment and qualification of the receivers on October 31, 1908. In 1901 said Gay and Trumbull composed the firm of E. H. Gay & Co., and on the 18th day of December, 1901, the Hudson River Electric Company, the Hudson River Water Power Company, and E. H. Gay & Co. entered into a contract whereby the Electric Company was to issue the $3,000,000 of bonds (secured by the $3,000,000 mortgage to the Morton Trust Company of same date), as it should require funds for the purchase of property, rights, and franchises, and the improvement of same as then owned or thereafter acquired. The Hudson River Water Power Company was to guarantee the bonds as follows:

"Whereas, the Hudson River Water Power Company has voted and agreed to indorse and guarantee the payment of the within bond and of all other bonds of the same series:

"Now, therefore, for value received, and in consideration of the purchase of the within bond by the holder thereof, the Hudson River Water Power Company hereby indorses the within bond and guarantees to the holder, or, if registered, then to the registered owner thereof, the payment in full of the principal and interest as provided thereby, together with all costs, charges and expenses in connection with said bond or the mortgage whereby it is secured."

The National Contracting Company objects that the Water Power Company had no power to indorse the bonds; but I think the contract was one of guaranty and am of the opinion that it must be so construed. The "Water Power Company hereby indorses the within bond and guarantees to the holder * * * the payment in full," etc. I do not think this invalidates the contract of guaranty or the mortgage.

On the 19th day of December, 1901, an agreement was made between the Water Power Company and the Electric Company, whereby, in consideration of the sale to it of 995 shares of the stock of the Electric Company, the Water Power Company agreed to pay to the Electric Company $25,000 and to guarantee the payment of such bonds, principal and interest.

It is true that these agreements do not refer to or contain any provision for the giving of any security for such guaranty by mortgage or otherwise. However, the Morton Trust Company, now Guaranty Trust Company, cross-complainant, has shown an oral agreement as follows: Prior to the execution of the said agreement of December 18, 1901, and as part of the negotiations resulting in the agreement and that of December 19th, and what followed, Mr. Ashley, as president of the Hudson River Water Power Company, stated to Gay and the others interested that he was "prepared to supply any necessary legal protection that could be given to the Electric Company bonds." The case shows that the Hudson River Water Power Company was deeply interested financially in floating these bonds of the Electric Company. Its continuance of work on its dam seemed to de-

pend thereon, and I can see no reason to question the fact that the statement was made. Gay & Co. took a part only of these bonds in the first instance, but had an option for all, and I think it was understood that Gay & Co. could better dispose of these bonds than any other person. Mr. Gay in negotiating the bonds to large companies, and especially a large block to the Sun Life Insurance Company of Montreal, Canada, found some difficulty, and the proposed purchasers, not being content with the simple guaranty of the Hudson River Company, required security on its property. Mr. Gay says that "I made a demand upon president Ashley that the requirement of the Sun Life Insurance Company should be carried out through a conveyance in a supplemental mortgage of the additional security called for," and also that he informed Mr. Ashley that if Gay & Co. was to continue to purchase the bonds the mortgage security must be given. Thereupon the mortgage was given, and the sale of bonds to the Sun Life Insurance Company was consummated, and Gay & Co. continued to take the bonds under its option to purchase and dispose of them. I fail to see a want of consideration for this mortgage. It was given and recorded. The Hudson River Water Power Company had already guaranteed $905,000 of the bonds and continued so to do. It had the right to secure its guaranty. The bonds issued and guaranteed prior to this collateral mortgage, as well as the balance of the $3,000,000, were taken by E. H. Gay & Co. through E. H. Gay, who was treasurer of both companies. November 1, 1908, the Electric Company made default in payment of interest, and it was duly elected that the whole principal should become due, and thereafter by leave of this court these foreclosure proceedings were instituted.

The National Contracting Company, as judgment creditor of the Hudson River Water Power Company, claims:

(1) That there is no proof that the original guaranty of December 18, 1901, was made pursuant to the unanimous consent of the stockholders of such company as required by statute then in force, and that, as it is not shown that the bonds secured by such guaranty are in the hands of purchasers for value and without notice of such omission, the guaranty is invalid and void as to the Contracting Company. (2) It appears on the face of the guaranty contained in such collateral mortgage that the consent of the stockholders of the Water Power Company to such guaranty was not given at a meeting called in the manner required by statute. (3) The claim of the National Contracting Company having accrued prior to the giving of the guaranties, although reduced to judgment thereafter, such claim constitutes a lien in equity prior to that of such collateral mortgage, the Water Power Company having divested itself of means to pay its then outstanding debts without an equivalent in value having been received in return therefor, and therefore the claims of the bondholders are subordinated in equity to the rights of the Contracting Company. (4) That this is especially true as to the holders of $905,000 of the bonds sold prior to the execution of such collateral mortgage, as they did not and could not have relied upon such mortgage. (5) That, as to such bonds, $905,000, the collateral mortgage is without considera-

tion and void. (6) That the proceeds of the bonds of the Electric Company was not used for the purpose specified therein and in the proceedings, etc., authorizing them, but were diverted to other purposes, and that as to holders with notice the guaranty cannot be enforced. (7) Finally, the liability of the Water Power Company being conditioned and secondary, such mortgage can be enforced for any deficiency arising on a sale of the property of the Electric Company under the first mortgage only.

It is unquestionably true that the liability of the Hudson River Water Power Company on this collateral mortgage is secondary to the liability of the Electric Company, and that if the property of the Electric Company brings enough to pay costs and charges and liens, if any, prior to the first mortgage thereon, and the $3,000,000 of bonds and interest, the liability of the Water Power Company on such collateral mortgage will end. But I do not see that, under the conditions shown here, this fact bars a decree in foreclosure of such collateral mortgage until a sale has been had under the foreclosure of the principal mortgage and a deficiency determined. Whether or not the judgment of the National Contracting Company is prior in equity to that of the holders of these Electric bonds issued and guaranteed prior to the making of the collateral mortgage is immaterial on the question of a decree of foreclosure and sale, and the same is true as to the balance of such bonds. The evidence is that the entire $3,000,000 of the bonds of the Electric Company were sold to purchasers all over the country by Gay & Co. The judgment of the National Contracting Company is for about $330,000, including interest.

[4] By chapter 688, § 40, Laws of N. Y., approved May 18, 1892, "An act to amend the stock corporation law," it was provided:

"Any stock corporation may, in pursuance of a unanimous vote of its stockholders voting at a special meeting called for that purpose by notice in writing signed by a majority of the directors of such corporation stating the time and place and object of the meeting, and served upon each stockholder appearing as such upon the books of the corporation, personally or by mail at his last-known post office address at least sixty days prior to such meeting, guarantee the bonds of any other domestic corporation engaged in the same general line of business."

It is presumed that the officers of a corporation do their duty, and I find no evidence and am not pointed to any showing that this statute was not complied with substantially. It is said that the cross-complainant did not prove affirmatively that the statute was in fact complied with. But there is no proof it was not complied with, and it was recited that the Hudson River Water Power Company "has voted and agreed to indorse and guarantee the payment of the within bond and all other bonds of the same series." I think we are to assume, in the absence of proof to the contrary, that the Water Power Company by its stockholders so voted at a meeting duly called for the purpose, and that the purchasers of these bonds had the right to assume that the guaranty was duly and legally authorized and executed.

[5] There is no proof except by inference that Gay or Gay & Co. knew or had reason to believe that the statute had not been complied with, if it be true that it was not, and it would be intolerable to hold that the ultimate or secondary purchaser of a negotiable bond offered on the market and guaranteed by another corporation is bound to go to the record of the corporation executing the guaranty and ascertain at his peril that the requisite authority had been given at a duly called meeting of its stockholders. Louisville, etc., v. Louisville Trust Company, 174 U. S. 552, 19 Sup. Ct. 817, 43 L. Ed. 1081, expressly holds that, where a statute required the assent of the stockholders of the guaranteeing company, the bonds issued without such authority or assent were void as to purchasers with knowledge or notice of the want of such authority or assent, but valid as to purchasers in good faith and without such notice. I do not think there is any presumption of bad faith, or of notice of want of due authority conferred to make the guarantee. Conceding that without statutory authority the guaranty of the bonds of the Hudson River Electric Company by the Hudson River Water Power Company would have been beyond the scope of the powers of that company and strictly ultra vires, unlawful, and void (174 U. S. 567, 19 Sup. Ct. 817, 43 L. Ed. 1081, and cases there cited), still, as here there was statutory authority for doing the very act done, the mode of doing it and obtaining the authority of the stockholders being pointed out by the statute, the act of guaranteeing these bonds of the Electric Company was not ultra vires or void. Here the Power Company was not acting outside of or beyond the scope of its granted powers, but within them, although there may have been irregularities in the exercise of the granted power. Louisville, etc., v. Louisville Trust Co., 174 U. S. 552, 570, 19 Sup. Ct. 817, 824 (43 L. Ed. 1081), where it was held:

"The guaranty by the Louisville, New Albany & Chicago Railway Company of the bonds of the Beattyville Company was not ultra vires, in the sense of being outside the corporate powers of the former company; for the statute of 1883 expressly authorized such a company to execute such a guaranty, and its board of directors to direct its execution by the company. The statute, indeed, made it a prerequisite to the action of the board of directors, that it should be upon the petition of a majority of the stockholders; but this was only a regulation of the mode and the agencies by which the corporation should exercise the power granted to it.

"The distinction between the doing by a corporation of an act beyond the scope of the powers granted to it by law, on the one side, and an irregularity in the exercise of the granted powers, on the other, is well established, and has been constantly recognized by this court."

When the invalidity of such bonds is shown by the one contesting their validity, the burden of showing that he is a holder in good faith and for value is on the one seeking to enforce them. Lytle v. Lansing, 147 U. S. 59, 13 Sup. Ct. 254, 37 L. Ed. 78. But here the National Contracting Company has not shown that these bonds are void, and their invalidity does not appear. Applying the same principle to this guaranty, there is an utter absence of proof that the guaranty was ultra vires and void. On the other hand, the guaranty, as stated, was within the granted powers of the Hudson River Water Power Company, although there may not have been a compliance with the terms of

190 F.—50

the statute in exercising the power. When fraud or illegality in the inception of negotiable paper is shown, an indorsee, before he can recover, must show that he is a holder for value. So in the case of negotiable bonds, when it appears that such bonds were illegally or fraudulently issued, the burden of showing that they were purchased in good faith and for value is shifted to the one suing thereon. Stewart v. Lansing, 104 U. S. 505, 509, 26 L. Ed. 866.

I have yet to learn that the burden is on the holder of a negotiable promissory note or bond who purchased before maturity to show that there was no fraud or illegality in its inception. In Stewart v. Lansing, supra, cited and relied upon by the National Contracting Company, the court said, at page 510 of 104 U. S. (26 L. Ed. 866):

"Here the actual illegality of the paper was established. It was incumbent *therefore* on the plaintiff to show that he occupied the position of a bona fide holder before he could recover."

### Hudson River Electric Power Company.

This company was incorporated, as stated, in 1903, with a capital stock of $1,000,000, increased to $10,000,000. January 2, 1904, this corporation made and delivered its mortgage to Knickerbocker Trust Company as trustee to secure the payment of an issue of 5,000 bonds of the par value of $1,000 each. On the 8th day of April, 1905, the said Hudson River Water Power Company made a collateral mortgage to said Knickerbocker Trust Company as trustee to secure its guaranty of the said bonds. This mortgage was acknowledged and delivered April 10, 1905. The said bonds were all certified and issued bearing the guaranty of said Hudson River Water Power Company. It is said that some of these bonds, about $150,000, are held as collateral; but of this fact, if it be a fact, I find no proof in the record. The written agreement to guarantee the bonds was made and executed January 2, 1904. The consideration for same was $1,000,000 of the bonds and $1,000,000 of the stock of said Hudson River Electric Power Company. This plant is situated at Utica, N. Y. It erected a new plant and transmission lines to Clarks Mills and either constructed or became the owner of certain transmission lines known as Amsterdam and Johnstown lines, Johnstown and Little Falls lines and Ballston and Amsterdam lines. While Utica is about 95 miles from Albany, this plant (steam) and these lines were to form part of the system before referred to. When this collateral mortgage was executed and delivered, only $1,350,000 of the said Electric Power Company's bonds had been issued; the others were issued thereafter.

The only evidence of an agreement to give this or a similar collateral mortgage to secure the guaranty of the bonds is found in the mortgage itself. That recitation or statement is as follows:

"Whereas, the Power Company, at the time of the issue and guaranty of the bonds of said Hudson River Electric Power Company, at present outstanding, agreed with the purchaser of said bonds, on behalf of said purchaser, and all succeeding holders of such bonds, that it would at any time execute and deliver all such further agreements or instruments as such purchaser might reasonably request in order to more fully secure the guaranty of such principal and interest on the part of the Power Company by lien on the properties, rights, privileges and franchises of the Power Company, or

otherwise, as such purchaser or any successor holder of such bonds might request; and

"Whereas, the purchaser of said bonds and the present holders thereof have requested the Power Company to make, execute and deliver this indenture, as further security for the faithful performance of its obligations under said guaranty:

"Now therefore, this indenture witnesseth: That said Power Company, in consideration of the premises and of one dollar to it in hand paid by the Trust Company, as trustee, the receipt whereof is hereby acknowledged, in order to secure the prompt payment and fulfillment of the guaranty by the Power Company of the principal and interest of the bonds of the Electric Company, issued or to be issued under said mortgage or deed of trust from the Electric Company to the Trust Company, its successor or successors and assigns in the trust, has granted, bargained, sold, conveyed, transferred, assigned and mortgaged, and by these presents does grant, bargain, sell, convey, transfer, assign and mortgage, unto the said Knickerbocker Trust Company, as trustee, its successor or successors and assigns in the trust, all those certain pieces or parcels and lots of land, water rights, easements and appurtenances, stocks, bonds and other securities more particularly described as follows."

Here, also, as in case of the guaranty of the Electric Company bonds, the cross-complainant did not prove the actual meeting of the stockholders, the call, or what occurred at such meeting if one was held to authorize the contract of guaranty. The record does show the meetings held authorizing the execution of the collateral mortgage. The same question is raised here as in the case of Morton Trust Company v. Hudson River Water Power Company on its guaranty of the Electric Company's bonds already discussed. Here, however, there is scant proof outside the recitation of the mortgage that the purchasers of the bonds or any of them actually requested the execution of this mortgage. These questions are important here, as the National Contracting Company, in addition to the defenses and objections before referred to, claims that this $5,000,000 collateral mortgage was executed and delivered by the Hudson River Water Power Company "at a time when the said Hudson River Water Power Company was insolvent and with intent to prefer the Knickerbocker Trust Company as trustee, and the holders of the bonds issued by said Hudson River Electric Power Company, over the fair and just creditors of said Hudson River Power Company, and with intent to hinder, delay, and defraud the just and fair creditors of said company, including the National Contracting Company."

The special master, on the evidence, has so found; but he has not found that the Knickerbocker Trust Company or any of its officers had any such intent or purpose in receiving such collateral mortgage, or that it had any knowledge of such intent and purpose on the part of the Hudson River Water Power Company or participation therein. At that time the hereinbefore mentioned claim of the National Contracting Company was in suit, and on the 31st day of March, 1905, Judge Bookstaver, the referee before whom the action had been tried, had rendered a decision in favor of the National Contracting Company and against the defendant Hudson River Water Power Company for $547,896.40 damages, and judgment was about to be entered. The officers of the company had learned of this adverse decision—subsequently reversed—and it cannot be doubted, I think, that the prospect of this

judgment accelerated the action of the Water Power Company in complying with the agreement recited in the mortgage to execute further instruments and security for the guaranty. There is no evidence in the case that the Knickerbocker Trust Company at that time knew of this litigation or of this decision of Referee Bookstaver. It cannot be inferred that it had any intent to receive a preference or to participate in any hindrance or delay of the creditors of the Water Power Company in then executing the mortgage. It received what it was entitled to—what it had been agreed it should have. There is no evidence that the recital of the mortgage was untrue.

[6] It may be remarked here that, as in the case of the guaranty of the bonds of the Electric Company, the agreement for the guaranty, the respective guaranties on the several bonds and the mortgages themselves were executed under the seal of the corporation. There is a general rule not only that officers of corporations acting within the general scope of their powers do their duty, but that the seal of the corporation affixed to written instruments executed by them in the business of the corporation imports and raises the presumption that they were duly authorized to execute the instrument. This rule is stated in 10 Cyc. 1017, 1018, where many cases are cited as follows:

"In General. When the authenticity of the seal is established, either by proof or by presumptive evidence as already indicated, it carries with it presumptive or prima facie proof of everything else which is necessary to the validity of the instrument. Roundly stated, it carries with it prima facie evidence of the assent of the corporation to the deed. It carries with it the presumption that the seal was rightfully affixed to the deed or the other instrument on which it appears. In favor of innocent third parties without notice it cures any antecedent irregularities, such as the fact that the resolution of the directors authorizing the execution of the instrument was passed at a meeting at which less than a quorum was present.

"(11) Is Presumptive Evidence of Authority of Officers Who Signed, Sealed, and Acknowledged it. (A) In General. The seal, accompanied with the signature or signatures of the appropriate corporate officer or officers, becomes prima facie evidence that such officer or officers had due authority from the corporation to execute the instrument, such as casts the burden of proof upon any party challenging its validity."

See, also, Jourdan, as Receiver, v. Long Island R. Co., 115 N. Y. 380, 22 N. E. 153.

It is probable that the Hudson River Water Power Company was in fact insolvent at the time it executed this collateral mortgage. Its property, if then converted into money by the ordinary processes, would not have paid its debts. It had been paying its debts and interest in due course. Insolvency had not been contemplated, and it may be doubted that it was then insolvent in the sense of that word as used in section 48 of the stock corporation law of the state of New York. But, however that may be, the Hudson River Water Power Company was not insolvent, nor was its insolvency imminent, when the written agreement to guarantee the bonds of the Electric Power Company was executed and the agreement made to execute and deliver security for such guaranty within the true intent and meaning of the statute referred to. There is no proof of any such condition or impending condition. It may be that there was no market value for such property and rights as the company, then, January 2, 1904,

possessed. Its dam and plant were incomplete, and in November, 1908, were still incomplete; but it was "a going" corporation, doing business, improving its plant, and paying its bills and interest. Its future was promising and seemed assured.

[7] Section 48 of the stock corporation law (chapter 354, § 48, Laws of 1901) reads as follows:

"No conveyance, assignment or transfer of any property of any such corporation by it or by any officer. director or stockholder thereof. nor any payment made. judgment suffered. lien created or security given by it or by any officer, director or stockholder when the corporation is insolvent or its insolvency is imminent, with the intent of giving a preference to any particular creditor over other creditors of the corporation shall be valid, except that laborers' wages for services shall be preferred claims and be entitled to payment before any other creditors out of the corporation assets in excess of valid prior liens or incumbrances. * * * Every transfer or assignment or other act done in violation of the foregoing provisions of this section shall be void. * * * No such conveyance. assignment or transfer shall be void in the hands of a purchaser for a valuable consideration without notice."

If that statute is to be applied strictly, and is strictly and literally applicable to such a case as this. it may be that this collateral mortgage is void as to the creditors of the Hudson River Water Power Company. But I do not think it is so applicable or to be applied literally and strictly here or in such a case as this. The statute quoted is drastic in its terms; but it is to be read and construed in the "light of reason," an old doctrine, but one sometimes ignored or forgotten. Here the agreement to guarantee the bonds had been made, executed, and delivered in good faith and for an adequate consideration long before; the agreement had been made, as I must find, to give the collateral security, not this particular security, but security, a "lien" which embraced or included it in good faith and for a valuable consideration at the same time; bonds had been issued and certified and put on the market; the Knickerbocker Trust Company as trustee expected the security and had the undoubted right to it at any time even if intermediate the making the agreement to give the security or lien and its actual execution and delivery the Water Power Company became insolvent. The statute was not intended to invalidate or render ineffective or worthless prior contracts made in good faith and for a valuable consideration. This is not a case under the bankruptcy act making all preferences given within four months of filing the petition voidable by the trustee.

In Paulding v. Chrome Steel Co., 94 N. Y. 334, in face of the Revised Statutes, quite similar to the present statute, the validity of a chattel mortgage as security for a debt was upheld, although executed on the very eve of insolvency, for the reason it was simply the carrying out or execution of a prior agreement previously made in good faith to give such security. The corporation had borrowed money on an agreement that its payment should be secured by a chattel mortgage, and one was given in 1874, which for reason was either void or supposed to be void. In 1878, the debt remaining unpaid, a new mortgage was given. The corporation was then insolvent. The mortgage was held good, and at page 340 of 94 N. Y. the court said:

"It is difficult to see how, under these circumstances, it could properly be held that the mortgage was given in contravention of the statute, or how in any way the insolvency of the company induced its execution. In the case cited (Dutcher v. Importers' & Traders' Bank, supra [59 N. Y. 5]) it is in substance held that a company, although insolvent, may deal with its creditors by making payment, or in the ordinary course of business transfer or sell its property. It follows then that some other fact must be proved before it can be held that a transfer thus made is fraudulent; and in considering that question the date of the agreement pursuant to which any transfer is made, and not the day when the conveyance is in fact executed, is to be regarded. As between the parties, at any rate, the fulfillment of the agreement relates back to the time when the obligation was incurred. Ex parte Kevan, L. R., 9 Ch. App. Cas. 752; Castle v. Lewis, 78 N. Y. 131."

In Black, as Receiver, v. Ellis, 197 N. Y. 402, 412, 90 N. E. 958, a new chattel mortgage was given to secure the payment of an old debt, which was by agreement to be secured by a chattel mortgage, and which had been at a prior time so secured. It was claimed that the giving of this new chattel mortgage, not a renewal of the old one, was in violation of section 48 of the stock corporation law before quoted. The Court of Appeals, no dissent, held that this contention could not be sustained, since the renewal of the old mortgage by the giving of the new mortgage "must be construed as relating back to and simply effectuating the contractual obligation originally assumed." The Court of Appeals (page 412 of 197 N. Y., page 961 of 90 N. E.) quoted and approved the language of Judge McCall at Special Term where the learned judge said:

"This mortgage, executed on March 20, 1907, when it may be conceded the corporation was insolvent, was but the observance of contractual obligations entered into and assumed in July, 1904, at which time no question exists as to its absolute soundness. * * * That which transpired on March 20, 1907, does not fall within the prohibition of the statute, but must be construed as relating back to May, 1904, and simply effectuating the contractual obligation at that time assumed."

Again as was said in Black v. Ellis, supra, as a principle applicable in that case:

"Courts of equity regard the substance and not the form of a transaction, and one of the favorite maxims is to regard that as done which has been agreed to be done and ought to have been done."

I can discover no distinction between that case and the one now under discussion in principle. The facts differ in that there a prior mortgage had been given, but that was not the point of the case. The pivot was that there was a prior agreement to give a mortgage as security, and that the giving of a mortgage at a subsequent date when the corporation had become insolvent related back to the date of the agreement to give it and must be treated, so far as the provisions of section 48 of the stock corporation law was concerned, as having been executed and delivered at the date of the agreement to give it.

The case of Foster et al. v. McAlester et al. (Eighth Circuit) 114 Fed. 145, 153, 154, 52 C. C. A. 107, 115, 116, is quite in point here. There the court held:

"An agreement between a wholesale mercantile firm and a customer that the latter will give a mortgage on his stock, when demanded, to secure his indebtedness to the firm, is entirely legal; and, unless fraudulent in fact,

such an agreement cannot be held to constitute a fraud in law, or a badge of fraud, to affect the validity of a mortgage subsequently requested, and voluntarily given by the debtor.   *   *   *

"A chattel mortgage, valid on its face, taken by a bona fide creditor for the purpose of securing his debt, and not for the purpose or with the intent of shielding his debtor and assisting him to hinder and delay his other creditors, is valid, and impervious to attack from any quarter, in the absence of a bankruptcy law which renders it invalid as a preference."

In Huiskamp v. Wagon Co., 121 U. S. 310, 319, 7 Sup. Ct. 899, 902, 30 L. Ed. 971, the Supreme Court said:

"In order to invalidate the mortgage of Rummel to Huiskamp Bros., it must have been made with the intent on the part of Rummel to hinder and delay his other creditors, and Huiskamp Bros. must have accepted it with the intent of assisting Rummel to hinder and delay his other creditors. A debtor being in failing circumstances and having the right to prefer a creditor, if the preferred creditor has a bona fide debt, and takes a mortgage with the intent of securing such debt, and not with the purpose of aiding the debtor to hinder and delay other creditors, the mortgage is valid, even though the mortgagee knows that the debtor is insolvent, and that the debtor's intention is to hinder and delay other creditors."

I conclude from the authorities that: (1) The agreement to give the lien having been sufficiently proved in the manner stated and not disproved, and having been made in good faith and for a valuable consideration at a time when insolvency was not contemplated or imminent, same was valid. (2) This having been followed by a request for the security, and the security having been executed and delivered pursuant to the said agreement, its execution and delivery relates back to the date of the agreement and speaks as of that date so far as the statute quoted is concerned. (3) That, as the Knickerbocker Trust Company received it pursuant to a valid agreement and for a valid consideration and in good faith, it is immaterial whether or not the Hudson River Water Power Company was solvent or insolvent at the time of the actual execution and delivery of the instrument and what the real object and purpose of the Water Power Company in giving it at that time was, so long as the Trust Company did not share or participate in any fraudulent intent or purpose.

### Morton Trust Company Equitable Lien.

This claim of an equitable lien raises an issue between the Morton Trust Company as trustee and Trust Company of America as trustee, growing out of the following facts: The Hudson River Water Power Company was incorporated prior to the incorporation of the Hudson River Electric Company as before stated. It is quite apparent from the record that the Water Power Company was short of funds for prosecuting its work, the construction of the Spier Falls dam and plant. The Electric Company was thereupon incorporated and had or constructed transmission lines only, or in the main. It had some stock of the Hudson River Power Transmission Company. Its president, Peddrick, was an employé of the Water Power Company, and the stockholders and directors were, in the main, the same as those of the Water Power Company. The Hudson River Power Transmission Company was in existence with a steam and water power plant at

Mechanicville lower down the river; but it had transmission lines sufficient for its power. The completion of the dam and plant of the Water Power Company was essential to the existence of the Electric Company. It was power generated by it, in the main at least, that the Electric Company was to transmit or purchase and transmit. The offices of the two corporations were in the same building at Glens Falls, N. Y., and the bookkeeping there was all done by the same persons, and the deeds and papers of both corporations were in the same safe. Gay, of Gay & Co., was treasurer of both, and Gay & Co. had the sale of most of the bonds of both. The Electric Company was almost immediately mortgaged for $3,000,000, and, as we have seen, the Water Power Company guaranteed its bonds. Later it executed the collateral mortgage to secure such guaranty showing clearly the interest and anxiety of the Water Power Company to convert the Electric bonds into cash. Receivers' Exhibit R–1, an extract from the books of the Hudson River Water Power Company, "Account of Hudson River Electric Company," May 1, 1901, to May 1, 1905, shows that between October, 1901, and March, 1904, the Water Power Company received of the proceeds of the Electric Company bonds $2,269,981.28, in cash. Of this about $1,391,500 was turned over by the Electric Company between October, 1901, and December 31, 1902, and $800,500 between January, 1903, and August 31, 1903. It also credited the Electric Company with 29,000 shares of the capital stock of the Electric Company. It also credited that company with earnings, accounts due it, etc., in all, prior to May 1, 1905, $4,-116,701.42; but this includes an alleged purchase of the balance of the stock of Electric Company, except 5 shares, $25,000, and of its pole lines of $313,200, etc.

[8] In the mortgage of December 18, 1901, executed by the Electric Company, the bonds issued under which were guaranteed by the Hudson River Water Power Company, it was provided the remaining bonds numbered from 501 to 3,000 ($2,500,000 par value), both inclusive, shall be issued by the Electric Company only for the purpose of acquiring stock, bonds, notes, evidences of debt, other property, rights, or franchises, or making improvements upon or extensions or additions to property rights or franchises which the Electric Company shall at the time of such issue own, or in which said Electric Company shall then be interested. The Electric Company was taking power from the said Transmission Company and was in a way and to an extent interested in it, as until the Hudson River Water Power Company's dam and plant were completed or on a working basis it had no other source of supply and hence no business. In 1902 it had a large majority of the stock of the Transmission Company. However, it was interested in the Hudson River Water Power Company, as its organization, officers, stockholders, business, management, and disposition of its stock and of the proceed of its bonds show. There can be no question that here was an express consent in the mortgage executed by the officers of the Electric Company that the proceeds of these bonds should be used, if desired, in the construction and maintenance and extension and improvement of the dam and plant of the

Hudson River Water Power Company. This is further evidenced by the tripartite agreement of December 18, 1901, between Gay & Co., the Electric Company, and the Hudson River Water Power Company for the guarantee and dispositon of the bonds of the Electric Company. I fail, under the facts appearing in the record, and in view of this provision of the mortgage, to discover any diversion or misappropriation of the proceeds of these bonds. I think the money was used where the stockholders, directors, and officers of both companies intended and expected it would be used. The special master does not find any misappropriation or diversion or state of facts justifying such inference. The Morton Trust Company, now Guaranty Trust Company of New York, clearly had knowledge of this provision of the mortgage and was at least put on inquiry, and there is no evidence that it was misinformed as to the facts. It cannot complain, in view of all the facts and recitals.

It is true that the mortgage stated that the bonds were to be secured by a first mortgage on the property, rights, and franchises of the Electric Company, whether then acquired or thereafter acquired; but it also explicitly stated at least twice that the proceeds of bonds of the face value of $2,500,000 might and could be used for making improvements upon or extensions or additions to property, rights, or franchises in which the Electric Company was, at the time of the issue of the bonds, interested. I think it unreasonable, in the light of the existing facts and circumstances and of what was actually done, to limit these words to a company in which the Electric Company had a stock ownership, or an actual property ownership of some kind. We can hardly charge the officers and managers of these two corporations with a willful misappropriation or diversion of these funds. When two purposes are consistent with the proven facts, one honest and lawful and the other dishonest and unlawful, we are to impute to the actors the lawful and honest purpose consistent with a faithful discharge of duty. The bonds of each company were sold without notice to the secondary purchasers of the actual facts, except that the Electric Company's mortgage gave notice of the use to which its bonds might be put. Both sets of bondholders are on an equality, unless it be that the holders of the bonds of the Electric Company are inferior in equity growing out of the fact the mortgage itself gave notice that the proceeds of the bonds might be used as mentioned for the benefit of any company in which the Electric Company was interested. Clearly the purchasers on the market of the bonds of the Hudson Water Power Company had no notice of any claim for an equitable lien of this or any character. I am therefore of the opinion, and hold, that no equitable lien has been established in favor of the Morton Trust Company as trustee, for the benefit of its bondholders. To establish or declare one on these facts and under all the circumstances would do a wrong to the holders of the bonds of the Hudson River Water Power Company which has guaranteed the bonds of the Electric Company.

It is true that, during the years 1902 and 1903, Mr. West was secretary and Mr. Gay treasurer of both these corporations, and it is

not unreasonable to suppose that both had knowledge of the terms of the mortgage of the Electric Company and of the use being made of the proceeds of the Electric Company's bonds, as indeed Mr. Ashley, the president of the Water Power Company, and Mr. Peddrick, an employé of that company and president of the Electric Company, must have known. That this was done by the common understanding cannot be doubted, and in view of the terms of the mortgage and the practical construction both companies gave to its terms, and in the absence of any protest against such action, I am constrained to the opinion that this was regarded as a mere loan of the one company to the other.

It also fully appears that, so soon as the Hudson River Water Power Company was in operation, it commenced selling and delivering its power to the Electric Company, and there is a large indebtedness of the Electric Company to the Hudson River Water Power Company which has not been proved, although a claim has been presented. It is evident to my mind that it was the mutual expectation and understanding that the Water Power Company would deliver power and pay all its indebtedness to the Electric Company, and that the whole transaction was treated as one of mutual indebtedness and account to be adjusted finally in the usual manner where such relations exist. The mode and manner of keeping the books and accounts show this. This is not the case of a vendor's lien for purchase money or of a purchase-money mortgage on after-acquired property, where as a matter of common justice the lien of the first mortgage, first in point of time and covering after-acquired property, is always understood to cover it subject to the equities of the vendor's lien or of the purchase-money mortgage. Here the lien of the first mortgage attached to the property of the Water Power Company, that which it then owned and that which it afterwards acquired; but can we say that every person who sold that company property which went into the construction of that dam and plant thereafter had and has a vendors' lien or any equitable lien therefor? If such were the law, there would be no necessity for our statutory lien laws to protect labor and materialmen.

It is, of course, true that where the mortgagor acquires property after the giving of a mortgage which by its terms is to come under the lien thereof and does so come, it comes in the precise situation and condition it is when purchased by the mortgagor, and, if it be then subject to a lien of any character held by a third party, such lien of such third party is in no way affected, and the mortgagee under the first mortgage mentioned takes his lien on such after-acquired property subject to the lien thereon existing when his mortgagor took his title. But here no lien existed on any of the property or material put into this dam or plant of the Water Power Company after the giving of the first mortgage. True the Water Power Company borrowed, so far as appears, the money of the Electric Company, and with it paid for labor and material which went into the construction of its dam and plant; but there was no agreement for a lien or security of any kind and no diversion or misappropriation or conversion of such money. The title of the Water Power Company to this dam and plant as improved and

added to by the expenditure of the money obtained rightfully from the Electric Company was not obtained under circumstances which gave the Electric Company any lien or equitable claim whatever, nor did the lien of the first mortgage thereon held by the Trust Company of America ripen or attach under circumstances which gave the Electric Company any such equitable lien or claim. As the dam and plant grew, the lien of the first mortgage attached; that is, the security grew more perfect and valuable. But the Trust Company of America had no knowledge or information that the accretions came from borrowed money even, much less trust funds or misappropriated or diverted funds belonging to another. If it looked into the matter at all and ascertained the facts, it learned that the Water Power Company was obtaining money from the Electric Company which it had borrowed on a mortgage through the medium of bonds secured thereby with the consent expressed in such mortgage that the money derived from a sale of the bonds might be used for the improvement, etc., of the property belonging to any company or corporation in which the mortgagor was interested, and that the Water Power Company was such company. The fault of the contention of the Morton Trust Company is that it assumes this money went into the hands of the Water Power Company impressed with a trust under the terms of which the money should have been used for the improvement, etc., of the property of the Electric Company and the consequent benefit of the holders of its bonds. This ignores the relations of the two companies and the very terms of the mortgage through which the money was obtained. Harris v. Youngstown Bridge Company, 90 Fed. 322, 33 C. C. A. 69, Irrigation Co. v. Garland, 164 U. S. 1, 17 Sup. Ct. 7, 41 L. Ed. 327, and Botsford v. R. Co., 41 Conn. 454, hold nothing inconsistent with these views; indeed, they support all that has been said in so far as the facts are similar or at all in point.

## National Contracting Company Lien.

[9] The National Contracting Company with its lien and judgment against the Hudson River Water Power Company, the nature and character of which claim has been sufficiently described, with date when such claim accrued, now claims specific equitable liens against the property of six of these corporations, viz.:

Hudson River Water Power Company, prior to all mortgage liens, the sum of..................................................$ 64,495 87

Hudson River Power Transmission Company ahead of the $500,000 mortgage to the Mercantile Trust Company as trustee and refunding mortgage held by Knickerbocker Trust Company as trustee for $750,000, the sum of............................... 12,500 00

Hudson River Power Transmission Company ahead of said refunding mortgage, the sum of..................................... 13,300 00

Hudson River Electric Company ahead of the $3,000,000 mortgage, the sum of........................................... 4,500 00

Hudson River Electric Power Company, prior to the $5,000,000 original mortgage, the sum of............................... 123,355 69

Saratoga Gas, Electric Light & Power Company, prior to the $200,000 mortgage, the sum of................................ 6,175 00

Madison County Gas & Electric Company, prior to second mortgage thereon of $50.000 bonds actually issued, the sum of...... 1,250 00

This contention arises from the following facts, over which there is little dispute except as to the construction, meaning, and legal effect of a certain agreement or stipulation made July 19, 1905, under the circumstances hereafter described: For the purposes of this discussion, it will be taken as true that the Hudson River Water Power Company was in fact insolvent within the meaning of the bankruptcy act at the time of the pendency of the bankruptcy proceedings hereafter described, and that the actual enforcement and collection of the judgment in favor of the National Contracting Company against that corporation, which then was upon the record, would have resulted in bankruptcy and an administration of its property in the bankruptcy court had the bankruptcy court had jurisdiction. March 31, 1905, Ex-Judge Bookstaver as referee made his decision, filed April 5, 1905, on the claim of the National Contracting Company in favor of that company for $547,696.40 damages, part for work and material put into the Spier Falls dam pursuant to the contract, and part for prospective profits. Judgment was about to be entered and was entered on the 12th day of April, 1905, for $554,680.43, including interest on the report and costs. Execution was issued on such judgment, which had been docketed in the proper counties, and returned wholly unsatisfied. In the meantime and between the making of such decision and the actual entry of judgment thereon, the collateral mortgage of $5,000,000, heretofore described to the Knickerbocker Trust Company as trustee, was executed and delivered, and the Hudson River Water Power Company made other dispositions of certain of its property not necessary here to describe. On the 11th day of May, 1905, a petition in bankruptcy was filed by the National Contracting Company and other creditors, in which other creditors subsequently joined by intervention, against said Hudson River Water Power Company in the District Court, in bankruptcy, in and for the Northern District of New York, the proper district. Thereupon that court appointed Charles W. Andrews, of Syracuse, N. Y., receiver in bankruptcy of all the property of said corporation, and he qualified and took actual possession of substantially all its property, books, and papers and by authority of the court continued its business. Certain investigations followed with certain motions, etc., unnecessary to describe, except that the court had refused to dismiss the proceedings for want of a showing of acts of bankruptcy and necessary petitioners. The corporation, alleged bankrupt, at that time, interposed an answer denying, amongst other things, the jurisdiction of the court and that it was subject to the bankruptcy law. This answer was never actually withdrawn, although long subsequently the board of directors passed a resolution acknowledging its inability to pay its debts and declaring its willingness to be adjudged a bankrupt. Of this mention will be made subsequently. That action was subsequent to and had nothing to do with the making of the agreement and stipulation mentioned and about to be described.

On the 19th day of July, 1905, it was stipulated in open court in said court of bankruptcy and then reduced to writing (reciting that it was made in the bankruptcy proceedings) and signed by Hudson River Water Power Company, by Eugene L. Ashley, president, and E. H. Gay

as treasurer, by Eugene L. Ashley and Eben H. Gay personally, and by Taylor L. Arms and Geo. B. Curtiss, of counsel, for said corporation, said Ashley and Gay, and filed with the court, as follows:

"In order to relieve the property of the Hudson River Water Power Company from the custody and control of the receiver heretofore appointed and to have such receiver discharged, the above-named parties hereby stipulate that on Wednesday, the 19th of July, 1905, there will be deposited with a trustee to be appointed by this court the sum of $250,000 cash; there will be delivered to said trustee the agreement of Hudson River Water Power Company to pay to the trustee the sum of $15,000 on the 20th of each month, beginning the 20th of August, 1905, and the letter or agreement of the General Electric Company that when it sends the amount of its monthly check for payment of energy supplied to it that it will notify Kellogg & Rose that if the amount of the monthly check is less than $15,000 that the Hudson River Water Power Company will turn over the check received from the General Electric Company together with other checks or money sufficient to make $15,000 on or before the 20th of August and the 20th of each month thereafter until such time as is hereinafter stated.

"That a bond will be given and delivered to the said trustee by the Hudson River Water Power Company with Eugene L. Ashley and Eben H. Gay as sureties, conditioned to pay the claim of the National Contracting Company; at the same time there will be delivered to the trustee and deposited with him as collateral to the above bond the bonds of the Hudson River Electric Power Company to the amount of the difference between the amount of the judgment of the National Contracting Company against the Hudson River Water Power Company with eighteen months' interest added less $250,000; the amount of these bonds to be calculated at 85.

"There will also be delivered to the trustee an agreement of E. H. Gay & Co. to take up said bonds at 90 and to substitute in their place cash, so that the trustee will have at the time hereinafter mentioned when such substitution is made in his hands, including the $250,000 cash and the amount received for the monthly payments of $15,000 herein specified, the full amount of the judgment of the National Contracting Company against the Hudson River Water Power Company with interest for eighteen months.

"The taking up of said bonds and the substitution of cash in their place is to be within thirty days after the decision of the Appellate Division of the Supreme Court of the State of New York First Department on the appeal now pending in said court from said judgment; and at any date on or before the first of January, 1906. This substitution and exchange of cash for bonds is to be made whether said judgment is affirmed, modified or reversed and without regard to the validity of said bonds. All of the moneys, bonds, securities or agreements hereinbefore mentioned to be held by the said trustee as security for the payment of the judgment or claim of the National Contracting Company against the Hudson River Water Power Company, and when said judgment is finally established or the claim is finally determined or settled said money or so much thereof as may be necessary is to be applied to the payment of such claim. In addition to this, the trustee's fees are to be fixed by the court and paid out of the fund or by the Hudson River Water Power Company. * * *

"It is further stipulated that the receiver is at once to render an account of his proceedings as such, and that if the same is found correct the account is to be passed, settled and allowed, and on the payment of the fund in his hands and turning over of the property received by him to the Hudson River Water Power Company, as shown by said account, he is to be relieved and discharged as receiver and the bond given by him is to be canceled.

"All letters, papers or exhibits in the hands of the receiver or master which came from the Hudson River Water Power Company are to be returned to the custody of the Hudson River Water Power Company and kept subject to the order of this court. * * *

"It is stipulated that in case of failure to make the monthly payments above mentioned of $15,000, or to take up the bonds and substitute cash therefor, as above stipulated, this court may upon five days' notice to George

B. Curtiss, and Taylor L. Arms or either of them appoint a receiver in bankruptcy of the Hudson River Water Power Company.

"It is further stipulated that if any judgment is obtained against the Hudson River Water Power Company and the same is not secured or paid within thirty days after the right to issue an execution accrues, then on like notice a receiver may be appointed by this court.

"It is further stipulated that when at any time the full amount of the judgment with eighteen months' interest is deposited in cash in the hands of the trustee under this stipulation and the claims of the petitioning creditors, other than the National Contracting Company, and of the intervening creditor who has come in in this proceeding, are paid in full, that the Hudson River Water Power Company may apply to this court to dismiss the bankruptcy proceeding, such dismissal to be without cost or liability against the National Contracting Company.

"It is further stipulated that the entering of this stipulation and the order thereon and the execution and carrying into effect of this stipulation shall in no wise affect the bankruptcy proceeding, except as herein provided; but that in case this stipulation is not fully carried into effect the rights and remedies of the petitioning creditors and of the bankrupt shall be and remain and be held and considered as of the date of the filing of the petition for adjudication in bankruptcy, namely, the 11th day of May, 1905, and not in any way affected by this stipulation or the proceedings under it."

There were provisions for paying the receiver and his counsel and the special master, and for modifying the injunction so as to permit the turning back of the property and business to the corporation and its officers. On the filing of such stipulation the court was asked to make an order in accordance therewith, which was done the same day. A motion to dismiss the proceedings and discharge the receiver on giving security had been made and was then pending, and this motion was by the order of July 19th denied; but the court did order, as follows:

"And in order to relieve the property and assets of said Hudson River Water Power Company from the claims of said receiver and to have the receivership terminated and the receiver discharged, the said Hudson River Water Power Company in open court by its president and treasurer and by its attorneys, stipulated as herein set out, and such stipulation being reduced to writing and signed is hereto annexed, and it appearing therefrom" —then follows the substance of the stipulation. "And it appearing to the court that the proposition so offered is for the interests of all parties, it is on motion of Kellogg & Rose, attorneys for the petitioning creditors, ordered that for the purpose of carrying out said proposed arrangement"—then followed a provision appointing said Charles W. Andrews a "special trustee" to take and receive the bonds, cash, etc., to be paid and held as security as provided for in the agreement.

With some changes in detail of deposit the stipulation was complied with by the deposit of bonds and cash with said "special trustee" and the execution and delivery of the personal bond of Ashley and Gay, and the property of the corporation was turned back to it, and it proceeded with its business as theretofore. The judgment referred to was appealed from and reversed. A new trial was had, and a judgment rendered in favor of the defendant on its counterclaim on the theory that the National Contracting Company violated the contract, and that the Water Power Company was entitled to judgment for the damages it had sustained by reason thereof. That judgment was appealed from, and the Court of Appeals reversed the judgment and a new trial was had before Chas. E. Rushmore as referee and resulted in the present judgment before mentioned. While this litigation was

going on and with the property returned to the Water Power Company, except such deposit, and it in full control of its affairs but with the bankruptcy proceedings still pending, motions were made in the bankruptcy court for an order releasing such deposit of bonds and cash and directing their return. These motions were opposed by the National Contracting Company, but finally granted, and an order of that court was made releasing the bonds, and another order was made later releasing the cash. The bond of Ashley and Gay was not released by any order of the court. Mr. Andrews, the special trustee, complied with the orders directing him to return the deposits, and he was discharged as such special trustee by order of the bankruptcy court. These orders were not appealed from. Later, the National Contracting Company made a motion or motions in said bankruptcy court for an order directing the return or restoration of such deposits. These motions were not granted. All these proceedings were had with the bankruptcy proceeding against the Water Power Company pending. On or about the 26th day of October, 1908, the equity suit referred to was instituted by Gay and Jackson, and said George W. Dunn, Charles W. Andrews, and Milton Delano were therein appointed receivers. At the same time they were appointed receivers of the property of the Water Power Company by the bankruptcy court in the bankruptcy proceeding pending against it, and they duly qualified as such, but took no other action whatever in the bankruptcy proceedings.

Shortly after the commencement of such equity suit, the directors of several of these corporations passed resolutions declaring their inability to pay their debts and their willingness to be adjudged bankrupts, and petitions in involuntary bankruptcy proceedings were thereupon filed against them. They made no defense; but the Circuit Court directed the receivers in the equity suit to contest the adjudications in bankruptcy proceedings, open them, and defend. This did not apply to the Water Power Company at that time. This was done and trial had, and the District Court held that the action of the directors in passing the resolutions before mentioned were in violation of the injunction granted against them in the Circuit Court in the equity suit, and that, being public utility corporations, they were not amenable to the bankruptcy law, and the court had no jurisdiction, and such bankruptcy proceedings were dismissed. Later the said receivers of said Water Power Company in the equity suit, in behalf of the corporation, raised the same question in the District Court by direction of the Circuit Court, and on a hearing and trial it was adjudicated by the bankruptcy court that, being a public service or public utility corporation, the Hudson River Water Power Company was not subject to the bankruptcy law, and that the District Court in bankruptcy had no jurisdiction or power, and that court thereupon, March 25, 1911, dismissed the bankruptcy proceedings and discharged the receivers. It was after the commencement of the equity suit and the granting of an injunction against its officers therein that the directors of the Hudson River Water Power Company held its meeting and adopted a resolution declaring its inability to pay its debts and its willingness to be adjudged a bankrupt and also directing the withdrawal of its answer in the then pending

bankruptcy proceedings. When the motions were made in the District Court for a release of such deposits of bonds and money with special trustee, Andrews, the true financial condition of the Water Power Company was concealed from the court; but the money and bonds were ordered returned without condition. No application was ever made to the bankruptcy court to vacate its orders releasing the said deposits on the ground of fraud or misrepresentation or concealment of facts. The bankruptcy court of course expected that the money would be used by that company as it saw fit in the conduct of its business.

The special master has found that the National Contracting Company still holds the personal bond of Ashley and Gay given in pursuance of such stipulation, and that there is no proof of the insolvency of Ashley. Gay has been adjudicated a bankrupt and discharged from all his debts.

The special master finds, and the evidence shows, that pursuant to the order of December 28, 1906, and January 3, 1907, said special trustee, Andrews, paid over and delivered to said Water Power Company $420,000, face value, of bonds, and $97,037.12 in cash; and that, pursuant to the subsequent order of July 29, 1907, the balance of cash with said special trustee (deposited with the Standard Trust Company) was paid over to said Water Power Company July 30, 1907, viz., $385,-023.62. The special master also finds that the return of these bonds and of this cash greatly benefited the Water Power Company and its said allied corporations. Out of the $97,037.12 returned January 3, 1907, the Water Power Company paid $1,063.64 to certain creditors in the special master's report named. Out of the said $385,023.62 so returned July 30, 1907, the Water Power Company paid out as follows:

| | |
|---|---:|
| July 31, to Hand, Bonney & Jones for legal services............$ | 9,245 87 |
| Aug. 1, to R. L. Hand for legal services...................... | 20,000 00 |
| Aug. 2, to E. T. Brackett for legal services.................. | 5,000 00 |
| Oct. 30, interest on its bonds, issued under first mortgage, due November 1, 1907...................................... | 13,000 00 |
| July 30, 1907, to Standard Trust Company a note of $125,000 for money loaned, dated April 29, 1907. and made by Hudson River Electric Power Company and indorsed by said Gay and said Ashley individually...................................... | 125,000 00 |

The money obtained on this note at the time it was discounted was used as follows: $48,450 paid to Trust Company of America for interest due May 1, 1907, on first-mortgage bonds of Water Power Company; $75,000 paid to Morton Trust Company for interest due May 1, 1907, on first-mortgage bonds of Hudson River Electric Company; $100 to Standard Trust Company for legal services connected with the loan; and $1,450 to E. H. Gay & Co. on account.

It will be noted that the note was made by the Electric Power Company, and that the proceeds were used in part to pay debts (coupons for interest) owing by Hudson River Water Power Company and by Hudson River Electric Company. When that note was given, so far as appears, it became the debt and obligation of the Hudson River Electric Power Company, then the controlling and managing corporation, secured by the personal indorsements of Ashley and Gay. The

debt was not secured by any lien on anything, except in the sense that the debt of a corporation is a lien or charge on its assets in a general way. The proceeds used for the benefit of the Water Power Company, $48,450, and of the Electric Company, $75,000, was treated as a loan to them on account and was charged to them in the accounts as any loan would have been or as a payment on account if anything was due and owing. There was no security or agreement for security. The Water Power Company and the Electric Company owed the Electric Power Company for these sums advanced, if it owed any one. They did not owe the Standard Trust Company. It is true, however, that the sums named were used for the benefit of such companies respectively. There may have been and probably was an obligation to repay to the Electric Power Company when it should pay the note; but these were debts pure and simple. The note and the indebtedness of the Electric Power Company created thereby, and the loans to the other corporations and the debts created thereby, if any, had no connection with or reference to the money then on deposit with the special trustee. When the $385,-023.62 was returned to the Water Power Company, it did not put it into any specific property or receptacle, but used it to pay the debt of another corporation represented by a note upon which it was not liable either as indorser or surety. The money did not release any lien on the property of the Water Power Company or of the Electric Company, but passed the same day, July 30, 1907, to the Standard Trust Company, and, if it augmented or increased the funds or property of any one, it increased that of the Standard Trust Company, who got the money.

If the Water Power Company owed the Electric Power Company the $48,450 and it took this way to discharge the debt, and if it so appears the Water Power Company paid its own debt in this way, but it did not use any of this money to pay a bondholder, either principal or interest, or to reduce its bonded indebtedness and thereby release or reduce the lien of the mortgage, nor did the Water Power Company add anything to its assets. There is no pretense that the money or any part of it was used to pay current operating expenses of the Hudson River Water Power Company or of any company in this combination. Conceding, for argument's sake and for the present, that the National Contracting Company had a lien on this money released and turned over to the Water Power Company, how does that fact make this $48,-450 a lien on the real estate and other personal property of the said corporation ahead of the first mortgage, when it appears that no part of it went to pay off or reduce bonds, interest, or other liens on the property, or to purchase property which went under the lien of the mortgage, or into the pockets or for the benefit of the bondholders under such first mortgage? There is no evidence that the Trust Company of America, trustee, or the bondholders, had any notice or knowledge of facts imparting notice, that the money used to pay the note held by the Standard Trust Company was subject to any lien in favor of the National Contracting Company, or that either the Water Power Company or the Electric Company obtained the money with which they paid the interest referred to from the Hudson River Electric Power

190 F.—51

Company, or that there was any indebtedness of either company to the Standard Trust Company.

Out of the $385,023.62 paid over as aforesaid by the special trustee July 29, 1907, there was paid September 28, 1907, to Knickerbocker Trust Company to pay interest due October 1, 1907, on refunding bonds secured by so-called refunding mortgage made by Hudson River Power Transmission Company $13,300, and the money was so applied, and the same day $12,500 of said money was paid the Mercantile Trust Company as trustee, to pay interest due on first-mortgage bonds due October 1, 1907, under a first mortgage made by said Transmission Company to the Mercantile Trust Company.. These payments were made direct to said trust companies by the checks of E. H. Gay as treasurer of the Hudson River Water Power Company drawn on the account to the credit of said Gay as such treasurer with said Standard Trust Company. While the National Contracting Company claims that both these payments are liens prior to the lien of the refunding mortgage, I do not see how under the prayer of the cross-bill it claims or can claim that the $12,500 paid as interest due October 1st on the first mortgage is a lien on the property of the said Transmission Company. The first mortgage is not in process of foreclosure. These direct payments of interest are within the same principles of law as the payment of $13,000, made October 30th, on the interest then due on first mortgage of $2,000,000 on the property of the Water Power Company, except that the latter sum was paid by the Water Power Company in satisfaction of interest on a mortgage by it on its own property, while, as to the payments of $13,300 and $12,500, the payments were made by the Water Power Company in reduction of interest due on mortgages on the property of the Transmission Company.

Out of the $97,037.12 returned to the Water Power Company January 3, 1907, said Gay as treasurer of that company paid January 29, 1907, to the Knickerbocker Trust Company as trustee the sum of $33,025.98 on account of interest due February 1, 1907, on the $5,000,000 executed by the Hudson River Electric Power Company.

On the 30th day of July, 1907, and again February 17, 1908, said Hudson River Water Power Company, by Gay, its treasurer, paid the interest on the mortgage of $200,000 ($123,500 of bonds actually issued), $3,087.50 on each date, in all $6,175.

On the 1st day of February, 1908, the said Water Power Company by check of said Gay as treasurer paid the interest that day due on the $50,000 first consolidated mortgage bonds of the Madison County Gas & Electric Company, out of said $385,023.62.

The National Contracting Company claims that as it had a lien on the money so returned, and it was actually used to pay interest on the bonded indebtedness of said corporations and reduced the bonded indebtedness of the said corporations by that much, and so benefited their bondholders at its expense, when the money should have been used (if used at all) for the sole benefit of the Hudson River Water Power Company against which the claim of the Contracting Company existed, that its lien follows the fund and attaches to the property of those corporations respectively prior to the lien of the respective

mortgages mentioned, to the amounts stated. There is no evidence in the case that the several trust companies, trustees, or bondholders had express or implied knowledge of the existence of any such claim as is now put forward by the National Contracting Company. The National Contracting Company knew the facts in relation to the creation, deposit, and release and return of this fund by order of the bankruptcy court. It did not appeal from such orders, and it must have known the Water Power Company would use the fund, probably for the common benefit of these companies, for it knew they were all under one control and management and were all being run as one company or concern, and also had knowledge of the manner in which the funds were collected, commingled, and disbursed. It was also informed of the mortgages and generally of the amount of the outstanding bonds. All this and more had been developed in the bankruptcy proceeding. There was no suggestion made at any time that there would be any change in the management of the corporations or the conduct of their financial affairs.

Assuming that the National Contracting Company had an equitable lien on the fund while with the special trustee, was it one created by the act of the court under the stipulation, or was it one created and existing independent of the court exercising its powers in the then pending proceeding in bankruptcy? And, whether the one or the other, in view of the want of knowledge thereof by the trust companies, trustees, or notice to them or to the bondholders, can it be held that the equitable lien followed the fund, as divided up, to the respective corporations, and attached itself to the respective properties as a lien prior to that of the mortgages mentioned? While I am of the opinion that no equitable lien existed in favor of the National Contracting Company on this fund or any part of it after its release by the court which created and directed and controlled it, acting without jurisdiction over the Hudson River Water Power Company and its property in point of fact, as to which more hereafter, I am also of the opinion that as to the payment of $125,000, made from this money to take up and pay the note of the Standard Trust Company given by the Hudson River Electric Power Company and indorsed by Ashley and Gay, no equitable lien followed and attached to the property of the Standard Trust Company which received it, and that clearly no equitable lien attached to the property of the Water Power Company or that of the Hudson River Electric Company in favor of the Contracting Company, as they did not receive it to pay interest on the bonds or to purchase property which went under the trust mortgages; but the Hudson River Water Power Company received it for its purposes generally with knowledge of the Contracting Company, and the Electric Company and its bondholders never had any of it directly or indirectly, and the Trust Company of America and the bondholders under that mortgage never had any part of it. Neither the Trust Company of America nor the Morton Trust Company nor the bondholders under the trust mortgages held by them received any part of that $125,000, and I know of no principle on which their security can be impaired for the reason that at a prior time their bondholders had

been paid $123,450 interest with borrowed money, money borrowed by the Electric Power Company, and which debt was subsequently paid with some of the alleged trust money. See Denton v. Davis, 18 Vesey, 499, a case in point. There was no prior arrangement or understanding that this was to be done. In Walker v. Brown, 165 U. S. 654, 664, 17 Sup. Ct. 453, 41 L. Ed. 865, and the authorities there referred to, and in Holly v. Missionary Society, 180 U. S. 284, 293, 294, 21 Sup. Ct. 395, 45 L. Ed. 531, and the cases there cited, and Ketchum v. St. Louis, 101 U. S. 306, 316, 25 L. Ed. 999, Pinch v. Anthony, 8 Allen (Mass.) 536, and in many other cases and in the text-books, the rule is stated in various forms, but always to the same effect, that parties by written or even oral agreement may set apart a specific fund or property for a specific purpose or for the payment of a specified debt or claim, not yet liquidated, and thereby impress that fund or property with a trust for the agreed purpose; that this trust follows the fund and property into which it has been changed or converted in the hands of the parties themselves for the benefit of the one and as against the other so long as it can be identified, and follows such fund or property into the hands of volunteers and also of third persons, strangers to the original transaction, who received same, or incumbrances thereon, with notice of the trust or of facts which should have put them on inquiry so that they may be said to have had notice. I fail to find any evidence that these trust companies, trustees, or the bondholders who received the interest had notice, express or implied, of this trust relation or agreement or of the source from which the money was derived.

Stephens v. Board of Education, 79 N. Y. 183, 35 Am. Rep. 511, is an illuminative case, and is cited and approved in Holly v. Missionary Society, supra. If the Water Power Company had paid a prior lien on its property mortgaged to the Trust Company with this fund, or a part of it, thus advancing the security of the bondholders, or with it had purchased specific property which passed under the lien of the trust mortgage, or had purchased property which did not pass under the trust mortgage, or had kept the money in bank, or had invested it in securities of any kind, assuming that the money was impressed with a trust, quite likely an equitable lien would attach to such property prior to the lien of the trust mortgages. But this did not happen. Having received the money from the special trustee pursuant to the order of the court, the Water Power Company proceeded to disburse it in the usual course of business as pursued by these companies, that is, using the funds of each and all the corporations for their common benefit, and the trust companies received it without notice of any trust in the usual course of business and proceeded to disburse it to the bondholders in payment of interest, who received it in the usual course of business without notice of any trust or alleged equitable lien. Neither the trust companies nor the bondholders were volunteers. Large sums of this money were disbursed by Gay as treasurer of the Water Power Company to Mr. Hand and Mr. Brackett in payment for legal services. Can the National Contracting Company recover it of them? Other general creditors were paid from this

fund. Can the Contracting Company recover from them? All these persons received the money in the usual course of business, and so far as appears in good faith. Suppose either of the individuals referred to had deposited the money in bank or kept it in a safe in their own homes, could the Contracting Company have recovered it of them? I think not. Stephens v. Board of Education, supra, 79 N. Y. 187, 188, 35 Am. Rep. 511. If the money itself cannot be followed into the hands of the bondholders, and recovered if found in their possession, how can this court, in effect, take it from them by making it a prior lien on the property mortgaged to secure the payment of their bonds?

[10] But did any lien or equitable charge, such as the law recognizes and will enforce, attach to this money and follow it into the hands of the Hudson River Water Power Company? The National Contracting Company with a judgment on its claim, subsequently reversed, instituted the bankruptcy proceedings. In fact, the bankruptcy court was without jurisdiction, as the Water Power Company was not subject to be adjudicated; the law having no application to it. Of course it was proper for the court to entertain the petition and ascertain the facts and then dismiss for want of jurisdiction to make an adjudication.

Prior to a determination of that question, the bankruptcy court took possession of the property (nearly all of it) of the alleged bankrupt, and the corporation, denying jurisdiction, asked the court to release and turn back its property to it. One of the petitioning creditors, the National Contracting Company, insisted on conditions, and the court imposed conditions, viz., that security for the claim of that creditor should be given, and it was given in the way described. The court in fact had no jurisdiction to impose such a condition. The Water Power Company, so far as the District Court in bankruptcy was concerned, had a perfect right to the full possession and control of its property without any condition whatever. By legal compulsion, wrongfully exercised, the Water Power Company, as a condition of obtaining its own from an officer of the court, was compelled to make the deposit and did make it. If, when the proceeding was dismissed for want of jurisdiction over the Hudson River Water Power Company and its property, the money and the bonds had been in the hands of Mr. Andrews as special trustee, constituted such by the order of the court, it would have been its duty to direct its release and return to the Hudson River Water Power Company, and it would have been the duty of such special trustee to obey the order and restore the property. The court, so far as it was concerned, was bound to order restoration and place the parties in the same condition as when the bankruptcy proceedings were instituted, except as to certain matters of payment, etc., not necessary to detail. The court could not dismiss the bankruptcy proceedings for want of jurisdiction in the first instance and retain any control over the property of the alleged bankrupt.

But it is said that this stipulation or agreement was a contract and agreement between the Hudson River Water Power Company and

the National Contracting Company, voluntarily made, one independent of the court or its action or compulsion, by which the corporation pledged this money and these bonds to the payment of the claim of the Contracting Company in any event, when and if established, and whether the court had jurisdiction or not, whether the proceedings were retained or dismissed. If this is so, the District Court had no power to direct the release and return of this money by the special trustee, and he was a wrongdoer in obeying the order. This was not the construction put on that stipulation by the court or by the parties. The order of the court was sought and obtained and the stipulation was attached and made a part of it. The court later exercised jurisdiction over the deposit and the trustee as its officer, not recognizing him as a mere agent of the National Contracting Company and the Water Power Company, no claim being made that such was the relation, and directed the restoration of the money, and it was restored pursuant to the order of the court notwithstanding the opposition of the National Contracting Company. The orders were not appealed from and no motion made to vacate as having been made without jurisdiction. In fact, the Contracting Company recognized this deposit as a proceeding in court by authority of the court and one over which the court had full control. It acquiesced in the construction put on the transaction and cannot say that Mr. Andrews violated a duty to the National Contracting Company to hold this money as agent or depositary for the satisfaction of the claim of that company when finally adjudicated. It was a part of the deposit agreement that the fund was to be placed by the special trustee with the Standard Trust Company, and this was done, and it had full knowledge of the stipulation and order, a copy of which was placed with it. When the orders of the court were made releasing the fund, it paid same over to the Water Power Company and disbursed it on the checks of its treasurer relying on the order of the court and without protest from the National Contracting Company or notice that it had or claimed any equitable lien thereon. Again, the stipulation was signed by the Hudson River Water Power Company and Ashley and Gay only. The Contracting Company signed nothing, gave up nothing to which it had any right, and forebore no right.

But it is said that the release of the money by the bankruptcy court was procured by concealment and fraud practiced upon it. The special master in effect so finds. If that court had been fully advised of the facts, the true condition of the Water Power Company, and especially of all the allied companies, quite likely it would not have made the orders at that time; but they were made and no motion has been made in the bankruptcy court to vacate or set them aside for fraud. But again, of what moment was that fraud, except in point of time, as the bankruptcy proceedings were subsequently dismissed for want of jurisdiction of the Water Power Company and its property, and that dismissal ended all power of the court in the premises over the deposit except to release it had it then remained with the special trustee. Suppose it had been with the said trustee March 28, 1911, when the proceedings were finally dismissed, could

Mr. Andrews have retained it for the benefit of the National Contracting Company on the theory he was a mere depositary agreed upon by the Water Power Company and the National Contracting Company and that the action of the bankruptcy court was immaterial and did not affect or terminate his powers and duties? I think not. I am of opinion that the stipulation, order, and deposit were based on and wholly supported by the proposition or supposition that the bankruptcy proceedings were valid and would be sustained although they might not be carried to a final termination in due course, and that when the proceeding fell the stipulation fell with it, and that the deposit reverted to the Water Power Company in the same condition as if the proceeding had not been instituted or the deposit made. I think it uncertain that the deposit made ever actually belonged to the Hudson River Water Power Company alone; but this will not be discussed. Clearly there is no proof that there was any diversion or misapplication of current earnings or of any lien growing out of the nonpayment of current operating expenses from current earnings. The claim of the National Contracting Company is not for an operating expense in any sense in whole or in part, and the money borrowed on notes, or a note to obtain money to pay interest, is not a claim for an operating expense. I have examined all the cases on this subject to which my attention has been called and fail to find anything which sustains the position of the National Contracting Company. It is of course true that creditors with unpaid claims incurred for operating expenses and who have the right to rely on the application of current earnings to their payment may have a lien on the property of the corporation ahead of the lien of a prior trust mortgage to secure the payment of bonds, if such current earnings applicable (so-called six months rule) have been diverted to pay the interest on such bonds.

In Ill. Trust & Savings Bank v. Doud, 105 Fed. 123, 148, 44 C. C. A. 389, 414, 52 L. R. A. 481, after a comprehensive and careful review of the cases, the Circuit Court of Appeals, Eighth Circuit, said:

"The class of claims which may be awarded a preference in payment over the prior mortgage debt in equity is limited to claims for current expenses incurred in the ordinary course of the operation of the mortgaged property within a limited time before the appointment of a receiver. It does not include claims for money loaned, or for material or labor furnished to make necessary beneficial and permanent additions or improvements to the mortgaged property. The broad language of the dicta in Fosdick v. Schall, that 'necessary operating and managing expenses, proper equipment, and useful improvements' are to be deducted from the current income before the net income out of which the mortgage debt is to be paid arises, has been disapproved and modified, and the class of claims entitled to equitable preference has been limited, by the later decisions of the Supreme Court" (citing cases) "to claims incurred for the current expenses of the operation of the mortgaged property in the ordinary course of business of the mortgagor. The test of the preferential equity of a claim is its consideration. If its consideration was a current expense of the operation of the mortgaged property, which inured to its benefit, and which was incurred in the ordinary course of its business, within a limited time anterior to the appointment of the receiver, the claim may be preferred."

The foregoing, I think, applies to and covers every disposition of this. fund paid over to the Water Power Company by Mr. Andrews· as special trustee. There is evidence of the payment of other notes, one or two, given at prior dates, for money borrowed and which was used to pay interest; but I do not regard it essential to detail the circumstances, as I have already covered the subject. This is true as to other payments made from this fund. My conclusion is that the National Contracting Company has failed to establish an equitable lien on the property of either of these corporations superior to the lien of the trust mortgages and the rights of the bondholders thereunder. The trust companies, as trustees, and their bondholders, respectively, were innocent parties in the receipt of these moneys. If the National Contracting Company had a lien in the first instance, while the deposit remained, it allowed it to lapse and may be said to have abandoned it, as it gave no notice to the special trustee, to the Trust Company with which it was then deposited, or to the trust companies holding the trust mortgages, and made no such claim even to the Water Power Company. If the Contracting Company was induced to this course by the fraud, concealment, or wrong of the Water Power Company or its officers, the mortgage bondholders, innocent of any wrong, cannot be made to suffer. This would be visiting the consequences of that wrong on innocent parties, who were not in a position to protect themselves, for the sake of protecting the National Contracting Company, which, if its theory is correct, had power to protect itself. I think the case is covered by what was said in Holly v. Missionary Society, 180 U. S. 284, 294, 21 Sup. Ct. 395, 398 (45 L. Ed. 531), viz.:

"Let it be conceded that he was not. in the circumstances, estopped from following his money into the hands of the Missionary Society, by having entered an attachment against Thompson for a fraudulent conversion of his money. Let it also be conceded that, by trusting his money with Thompson, who had theretofore been his attorney, and whose standing in the community was good, he was not guilty of conduct so reckless and negligent as to, of itself, deprive him of a remedy. Yet his case fails in the essential particular that he has not shown that the Missionary Society, in receiving from Thompson, executor, the money due from the estate of Rev. Dr. Saul, and in applying it in accordance with the appointments in the will, acted with any notice or knowledge, actual or imputable, that Thompson was misapplying funds intrusted to him by a third person with whom the society had no relations whatever. As against the Missionary Society, Holly, in the circumstances disclosed, has no equities; and, even if it could be said that the equities were equal, a court of equity will not transfer a loss that has already fallen upon one innocent party to another party equally innocent."

Also by State Bank v. United States, 114 U. S. 401, 5 Sup. Ct. 888, 29 L. Ed. 149.

Aside from the particular form of the decree and allowances and their amount, on which last question the parties in interest have agreed, there is but one other question, or rather three questions requiring consideration.

### Title to Certain Lands.

[11] This controversy is wholly between the Hudson River Water Power Company and the Hudson River Electric Company, and con-

sequently between their respective trustees, Trust Company of America and Morton Trust Company, as trustees.

As already stated, the offices of these two corporations were in the same rooms in the same building in the city of Glens Falls, N. Y. The officers, practically, were the same. They used a safe in common to which both had free access.

After the granting of the orders herein permitting foreclosure and the filing of the cross-bills, the attorney for the Morton Trust Company, in examining papers in the said safe used in common, found therein a duly executed deed or conveyance from the Hudson River Electric Company to the Hudson River Water Power Company, dated October 8, 1901, and acknowledged October 9, 1901, never recorded, and which conveys certain rights of way, pole lines, and equipment thereon so far as then constructed. Consideration expressed, $150,000, and Mr. Seay, comptroller of the companies, testifies that the Water Power Company gave credit to the Electric Company for that sum, and that it is included in Receivers' Exhibit R-1. The next day, or October 9, 1901, the Hudson River Water Power Company by reference to this deed as a description, viz., dated October 8, 1901, and recorded October ———, 1901, Liber ———, page ———, mortgaged this property, by a supplemental mortgage, to the Trust Company of America, and that mortgage was duly recorded in Saratoga County, N. Y., October 14, 1901. The $3,000,000 mortgage of the Hudson River Electric Company to the Morton Trust Company as trustee was dated December 18, 1901, and acknowledged December 24 and 26, 1901, and recorded December 27, 1901. There is no proof of the actual manual delivery of this deed. Delivery, if proved, is to be inferred from the making of the deed, the credit given by the Water Power Company to the Electric Company, and the mortgaging of the said property by reference to the deed from the Electric Company to the Water Power Company. There is no evidence as to actual change of possession, or that the Morton Trust Company when it took its mortgage knew of the deed to the Water Power Company. The mortgage to said Morton Trust Company did not specifically describe this property, but in general terms covered all the property, real and personal, of the said Hudson River Electric Company. During all this time the Hudson River Electric Company had the record title. The Morton Trust Company in examining title had no occasion to examine the mortgage from the Water Power Company to the Trust Company of America, as there was nothing to inform or suggest to it that the property had been deeded to the Water Power Company. The deed from the Electric Company to the Water Power Company was executed by Peddrick, president, and attested by E. J. West, secretary. The said mortgage by the said Electric Company to the Morton Trust Company was executed and attested by the same persons. So far as appears, they gave no notice or information as to the deed of the Morton Trust Company. The general description contained in the mortgage by the Electric Company to the Morton Trust Company was all-sufficient, as it had the record and the legal title and was in possession. Boynton v. Haggart, 120 Fed. 819, 57 C. C. A. 301. Under Page v. Waring, 76 N. Y.

463, as the parties in controversy claim from a common source, and the mortgage to the Morton Trust Company was actually recorded in December, 1901, and the deed to the Water Power Company was never recorded, and the Trust Company had no notice or knowledge of the unrecorded deed, and there was no change of possession, the mortgage of the Morton Trust Company must prevail over that of the Trust Company of America, which, although prior in date of record, was from the Water Power Company, and not from the Hudson River Electric Company, the one in possession and owner of the record title.

## Second Deed.

November 5, 1901, the Hudson River Electric Company, the record owner in possession, by deed dated that day, conveyed certain rights of way and pole lines, etc., thereon to the Hudson River Water Power Company. This deed was not recorded until October 24, 1902. November 5, 1901, the Water Power Company mortgaged such property by a supplemental mortgage to the Trust Company of America pursuant to a prior agreement to execute supplemental mortgages whenever it acquired additional lands, etc. This supplemental mortgage was recorded November 7, 1901.

December 18, 1901, and nearly a year before the deed to the Water Power Company was recorded, the Electric Company executed its $3,000,000 mortgage to the Morton Trust Company, as heretofore stated, to secure the payment of $3,000,000 of bonds. This mortgage was duly recorded December 27 and December 28, 1901, about 10 months before the deed to the Hudson River Water Power Company was recorded. There is no evidence of a change of possession prior to the time the Morton Trust Company as trustee took and recorded its mortgage or of notice to it of the said deed. In short, the Morton Trust Company took and recorded its mortgage months prior to the record of the deed to the Water Power Company without notice of such deed express or implied. It had no occasion to examine mortgages given by the Hudson River Water Power Company to any one, as there was no deed of record to the said company from the Electric Company.

Under the recording acts and the decisions referred to, it seems clear that the lien of the Morton Trust Company is superior to that of the Trust Company of America.

## Third Deed.

The $3,000,000 mortgage of the Electric Company to the Morton Trust Company, dated December 18, 1901, was recorded December 27 and 28, 1901, and covered all its property not excepted therefrom.

There was found in the safe used in common by the Electric Company and the Water Power Company an executed deed dated September 23, 1902, from the Hudson River Electric Company to the Hudson River Water Power Company. This deed has never been recorded, and there is no evidence that it was ever actually delivered. This deed covers certain pole lines or rights and pole lines thereon. A portion of the property described in this deed—the pole line and rights from Ballston Spa to Schenectady—was expressly excepted from the said mortgage of the Electric Company to the Morton Trust

Company. This portion of the pole lines and rights cannot be claimed by the Morton Trust Company; but it is clear that under the recording acts and the decisions the balance of such property is covered by the lien of the mortgage to said Morton Trust Company. The same day that this unrecorded deed was dated, the Hudson River Water Power Company mortgaged same to the Trust Company of America as trustee, by a supplemental mortgage. This mortgage was amongst the papers of the said Trust Company, but unrecorded, and the acceptance of the trust thereby declared was not signed by said Trust Company.

This tends to show an incomplete transaction, and in view of the facts that the deed was not recorded, that delivery is not proved, and that the Trust Company of America did not acknowledge its acceptance of the trust or record the mortgage, I am of the opinion the proof fails to show title to the pole line and rights from Ballston Spa to Schenectady in the Hudson River Water Power Company.

### Allowances.

As agreed by the parties and all interested in open court, the allowances to the receivers are fixed at $16,000 per annum each in addition to expenses as presented and filed, with $19,000 per annum to Abram J. Rose, and $16,000 per annum to Geo. B. Curtiss, their attorneys, in addition to their expenses as shown by accounts filed, all of which, in view of the value of the properties, their condition when received by the court and now, the reduction of expenses in managing them, the increase in business and net receipts, and the intricate and important questions settled and disposed of with great labor and intelligence, the court regards as reasonable and proper; such compensation to commence October 31, 1908, and terminate with the delivery of the deeds on a sale of such properties.

### The Decree.

The consolidated decree should provide for a sale of the Madison county property and any other property at the place prescribed by statute, as well as at the place of sale of the main properties the sale of the first-mentioned property to follow that of the others, and also an express provision reserving the right in the court to order a sale of the Madison county property and the Saratoga Gas, Electric Light & Power Company property separately and at such time as it shall fix in case of unreasonable or undue delay in executing the consolidated decree. The court has no reason to anticipate any such delay; but, as this is the ground urged against consolidation, I think the provision should go in the decree, which as I consider will be but declaratory of the power residing in the court whether expressly reserved or not.

There will be orders and decrees accordingly.